George W. WHITEMAN, Appellant,

v.

Elsoyd PITRIE, Appellee.

No. 15266.

United States Court of Appeals, Fifth Circuit.

March 22, 1955.

Thomas B. Wheeler, McClendon & Wheeler, New Orleans, La., for appellant.

Amos L. Ponder, Jr., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

RIVES, Circuit Judge.

Appellee, plaintiff below, complained that while he was working for appellant, defendant below, as a deckhand on a tug engaged in shifting barges, he sustained a broken arm as a result of negligence of the defendant and of defendant's failure to furnish him a safe place in which to work. Inland Waterways Corporation was the owner of the barge on which plaintiff was injured.

Three suits were filed on account of the accident. The first, Civil Action No. 3225, the subject of this appeal, was brought by the plaintiff under the Jones Act.[1] The appellant, defendant in the first action, filed a contingent action against Inland Waterways Corporation, being No. 2191 in Admiralty, for reimbursement of any judgment that might be rendered against him in the first action. A jury trial was asked in the first case, but in the second case a jury trial could not be had because the defendant corporation was entirely owned by the United States. Considerably later, the third suit, not here involved, was instituted, a direct action in admiralty by plaintiff, appellee, against Inland Waterways Corporation, in which defendant, appellant, was impleaded under the 56th Admiralty Rule, being No. 2290 in Admiralty.

A motion to consolidate the first and second cases was denied. It was, however, stipulated that the record on the jury trial of the first case could be used in the trial of the contingent libel at a later date. Certain written interrogatories were propounded by the defendant to the plaintiff which had not been answered at the time of trial.

The accident complained of was witnessed only by appellee. According to his testimony, it resulted from a defective winch, the dog or pawl on which gave way when he attempted to insert a crank in the winch to slack off a line. The crank struck his right arm breaking it in two places. The only person who saw the winch immediately after the accident was appellee's fellow deckhand, Labauve, who testified that he found the winch to be defective.[2] An inspector of the Federal Barge Line testified that, on the day after the injury, he examined the winch and found nothing wrong with it except a broken cable. A Marine surveyor testified that two days after the injury, he found three of the winches in that end of the barge intact and in operating condition, but the one on the port bow defective in that the brake did not work. The appellee and the witness, Labauve, each referred in their testimony to the starboard winch as being the one

---

1. 46 U.S.C.A. § 688. *"Recovery for injury to or death of seaman*

"Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees

shall be applicable. Jurisdiction in such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located."

2. "Q. Will you state after the accident occurred what you actually saw when you examined the winch aboard the starboard barge? A. Well, I looked at it, as I told you before. I had a flashlight, and I went up there and looked at it, and what I saw was that the winch—this dog wasn't in no condition to hold anything, the way it was twisted back, and I seen it had no hand line around it or nothing. That is about all. I just looked at it and seen that it wasn't working, that something had went wrong with it, and the handle wasn't in sight."

used, though the appellant held to a different opinion.[3]

The trial was had nearly three years after the injury. Plaintiff's arms and their relative movements were exhibited to the jury. Though he was right-handed, his right arm had become considerably smaller than his left. The plaintiff was totally unable to work for 6½ months after his injury but he was paid his wages during that time. His medical and hospital bills were also paid. He came back to work as an engineer, a better paying job. He testified: "Q. In other words, from the financial standpoint up to now, it hasn't really cost you anything, has it? A. No, sir." He further testified that he had only a third grade education, that the only engines he knew or had worked on were those of the defendant, that he was not qualified to be an enginer on other type Diesel engines, and that he felt that he would no longer be able to do the kind of manual labor or to hold the jobs for which he was qualified.

Two physicians testified as to the extent of his injuries, one introduced by the plaintiff and the other by the defendant. Their opinions did not materially differ. The physician introduced by defendant testified that one fracture extended into the wrist joint, and that a painful traumatic arthritis had resulted; he thought that the plaintiff had suffered a twenty-five to thirty percent permanent loss of the use of his right arm.

The court, after an able charge, to which no exceptions were reserved, submitted to the jury eight questions upon which the jury returned the following verdict:

"Question 1: Was the winch defective? Yes.

"Question 2: If so, was that defect a proximate cause of the plaintiff's injury? Yes.

"Question 3: Was the defendant guilty of negligence? Yes.

"Question 4: If so, was the negligence of defendant a proximate cause of the plaintiff's injury? Yes.

"Question 5: Was the plaintiff negligent? No.

"Question 6: If so, was his negligence a proximate cause of his injury? No.

"Question 7: If you find that the plaintiff was negligent and that his negligence was a proximate cause of his injuries, to what extent percentagewise did his negligence contribute to his injury? None.

"Question 8: We, the jury find the plaintiff's damages to be in the amount of $30,000.00.

"(Signed) Marion G. Faulkner, Foreman."

Judgment was entered upon the jury's verdict, the defendant's motion for new trial "and for a reduction of award and remittitur" was denied, and this appeal ensued. Appellant makes five specifications of error which we consider in their order.

Specification of Error **I**: *"The Court below erred in denying Appellant's motion to consolidate Civil Action No. 3225 with No. 2191 in Admiralty."*

I. Rule 42(a), Fed.Rules Civ. Proc.[4] providing for the consolidation of

---

3. "* * * I think the port winch, without knowing, did cause the damage, and I will go to the end thinking that. I will always think it was not the starboard winch that caused the damage, and I think the strain was from the lacing of that cavil to the port winch, because those barges did come together, and the lacing of those two cavils would not stop that barge from coming together. I think the port winch hurt that man, without knowing, because I did not see either one, but the strain was terrific on the winch, and the lacing was around the cavil, and I was told, to the port winch. The lacing from the cavil was, I was told, to the port winch."

4. Rule 42, Title 28 U.S.C.A.:

"(a) *Consolidation.* When actions involving a common question of law or fact are pending before the court, it *may* order a joint hearing or trial of any or all the matters in issue in the actions; it *may* order all the actions consolidated; and it

actions, is permissive and vests a purely discretionary power in the district court. "An exercise of such power may be reviewed on appeal from a final judgment or order but will not be disturbed except for abuse of discretion." 5 Moore's Federal Practice, 2nd ed., Para. 42.02, p. 1204. We find no abuse of discretion in denying the motion to consolidate the jury case with the non-jury case. Further, there is nothing in the record to show that the defendant was injured by the refusal to consolidate.

Specification of Error II: *"The Court below erred in allowing the case to go to trial before Appellant's interrogatories had been answered."*

■■ II. In the absence of any motion for continuance, objection to trial before the interrogatories were answered, or of any demand for such answers, the second specification does not merit discussion. Further, of course, if the district court had exercised its discretion in refusing to stay the proceedings such exercise would not be disturbed on appeal unless there had been an abuse of discretion. 53 Am.Jur., Trial, Sec. 15.

Specification of Error III: *"The jury erred in finding that Appellant was negligent."*

Specification of Error IV: *"The Court erred in not granting a new trial."*

■ III and IV. There was no motion for a directed verdict, and the third specification may be shortly answered by saying that we are without power to consider directly whether "the jury erred." 5 Moore's Federal Practice, 2nd ed., Para. 50.05(1), pp. 2322, 2323. As to the fourth specification, it is sometimes said that error cannot be assigned in not granting a new trial, but that is inaccurate. While the Seventh Amendment forbids the power to this Court to re-examine the facts found by a jury otherwise than according to the rules of the common law, it does not prevent this Court from reviewing the questions of law presented by the decision of the trial court on the motion for new trial. When the trial court abuses its discretion, that amounts to a *legal error* and may be reviewed as such. Virginian Ry. Co. v. Armentrant, 4 Cir., 166 F.2d 400, 407, 408, 4 A.L.R.2d 1064; 6 Moore's Federal Practice, 2nd ed., Para. 59.08(6), p. 3827, Notes 29 & 30.

> "* * * the grant or denial of a motion for new trial is not reviewable, except where the trial court acts under the compulsion of a mistake or law, or lacks power to grant the motion, as where the motion is not timely, or where the trial court fails to exercise its discretion, or where it abuses its discretion. And a motion for new trial on the ground that the verdict is against the weight of the evidence and the trial court's ruling thereon are within the foregoing principles." 6 Moore's Federal Practice, 2nd ed., Para. 59.08(5), p. 3816.

One of the leading authorities for the proposition that the denial of a motion for new trial is reviewable where the trial court fails to exercise its discretion is Marsh v. Illinois Cent. R. Co., 175 F.2d 498, 500, where this Court said:

> "A motion for new trial is addressed to the trial judge's discretion. He may grant a new trial if he thinks he has committed error; and he may grant one (and he alone can) because he thinks the verdict is wrong, though supported by some evidence. The exercise of his discretion is not ordinarily reviewable on appeal, though a failure to exercise discretion, or an abuse of it, may be corrected."

It was well said by Judge Borah, speaking for this Court, in Commercial Credit Corporation v. Pepper, 187 F.2d 71, 75, 76:

> "It is a principle well recognized in the federal courts that the granting or refusing of a new trial is a matter resting within the discretion

*may* make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay." (Emphasis supplied.)

of the trial court. The term 'discretion', however, when invoked as a guide to judicial action, means a sound discretion, exercised with regard to what is right and in the interests of justice. And an appellate court is not bound to stay its hand and place its stamp of approval on a case when it feels that injustice may result. Quite to the contrary, it is definitely recognized in numerous decisions that an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error."

 When should an Appellate Court reverse the district court for abuse of discretion in the denial of a motion for new trial, which was based on the ground that the verdict was against the weight of the evidence? The inherent nature of the question is such that it cannot be answered with certainty and exactness. About as definitely as the rule may be safely stated is that the discretion of both the appellate court and of the trial court should be exercised to nullify a seriously erroneous result and to prevent a miscarriage of justice. 6 Moore's Federal Practice, Para. 59.05(3), et seq., pp. 3743–3759. We think that the statement at the beginning of this opinion is sufficient to show that there was ample evidence to establish the defendant's liability, and that certainly to that extent there was no abuse of discretion in denying the motion for new trial. We shall consider the denial of the motion as based on the ground that the damages were excessive in connection with the next specification of error.

Specification of Error V: *"The amount of the award is grossly excessive and the Court below erred in not granting a remittitur."*

 V. If the district court considered the verdict excessive, it had the power, on motion, either to order a new trial, or to grant the plaintiff an election either to remit a stated portion of the amount or submit to a new trial. Dimick v. Schiedt, 293 U.S. 474, 486, 55 S.Ct.

296, 79 L.Ed. 603; 6 Moore's Federal Practice, Para. 59.05(3), pp. 3737, et seq.

 A simple restatement of the position of this Court is as follows: In reviewing a motion for new trial based on the ground of the inadequacy or excessiveness of the verdict, as well as one based on the ground that the verdict is against the weight of the evidence, the rule applies that " * * * an abuse of discretion is an exception to the rule that the granting or refusing of a new trial is not assignable as error." Commercial Credit Corporation v. Pepper, supra; Houston Coca-Cola Bottling Co. v. Kelley, 5 Cir., 131 F.2d 627, 628; Fort Worth & Denver Ry. Co. v. Roach, 5 Cir., 219 F.2d 351.

What are the tests for such abuse of discretion? Expressions have been employed such as "monstrous", Affolder v. New York, Chicago & St. L. R. Co., 339 U.S. 96, 101, 70 S.Ct. 509, 94 L.Ed. 683, and "so gross or inordinate in amount as to be contrary to right reason." (Chief Judge Hutcheson concurring in Sunray Oil Corporation v. Allbritton, 5 Cir., 188 F.2d 751. Compare the interesting discussion by Judge Lindley for the Seventh Circuit in Bucher v. Krause, 200 F.2d 576, 587. When all is said and done, however, the question by its very nature is one for which there can be no rule of thumb answer. Attempts at defining or making more certain and exact the tests of abuse of discretion do not usually furnish reliable guide posts, nor tend to clarify the rule.

Thus far Chief Judge HUTCHESON and Judge TUTTLE concur in the foregoing opinion. They are, however, of the further opinion, for reasons separately stated by Chief Judge HUTCHESON, Judge TUTTLE, concurring, that the district court abused its discretion, and erred as a matter of law, in denying a new trial for excessiveness, that the judgment should be reversed in part, that is in so far as it awards damages, and that the cause should be remanded with directions to grant a partial new trial limited to the issue of the amount of the plaintiff's damages. Judge RIVES

thinks that the district court committed no abuse of discretion in denying a new trial for excessiveness or in not conditionally requiring the plaintiff to consent to a remittitur, that the judgment should be affirmed, and he therefore concurs in part and dissents in part.

So much of the judgment as finds the defendant liable to the plaintiff is affirmed, and so much as awards damages to the plaintiff is reversed, and the cause is remanded for further proceedings consistent with the opinion of this Court.

Affirmed in part and reversed in part and remanded with directions.

Judge RIVES concurs in part and dissents in part.

HUTCHESON, Chief Judge.

Judge Tuttle and I concur in the opinion and conclusion as to Specifications of Error Nos. 1, 2, 3 and 4, and in the opinion but not in the conclusion as to Specifications of Error No. 5.

 It seems clear to us that the verdict was excessive as matter of law and that, in not setting it aside, the district judge abused, indeed transcended, his discretion and committed an error of law.

This is so because, as we read the record, reasonable minds guided by the evidence in the case rather than by sympathy or wishful thinking could not, in accordance with principles of right reason, have reached a verdict in such an amount.

On the undisputed evidence, this is the record showing on the quantum of damages:

(1) The accident has not damaged him financially, (He testified on the trial that from the financial standpoint, up to then it hadn't really cost him anything): (a) he was paid his full wages during the time he was unable to work and his medical and hospital bills had cost him nothing out of pocket; and (b) he has suffered no diminution but has had a considerable increase of earning power and earnings in the three years since his return to work as a result of being taught a new and more profitable trade.

(2) Plaintiff's witness, Dr. George Berkett, testified to having made two examinations, one about three months after the accident, another about 2½ years after it, that the first examination revealed that Pitrie had had two fractures, one in the upper part of his arm and one in the wrist, and that at the time of the trial, when he had attained maximum recovery, the residual physical disability of his right arm was twenty percent permanent partial.[1]

---

[1.] He testified that when he examined plaintiff, "the examination revealed there is no atrophy of the muscles of the shoulder girdle, and that he could raise his arm completely, abduct it completely. There was some hesitation in completing the abduction, but there was no disturbance in scapulohumeral rhythm on bringing the arm to the side. Forward flexion is complete. He was able to bring his arm completely in a forward plane. He lacked about twenty degrees of external rotation of the right shoulder as compared with the left. Internal rotation was complete. In other words, he did still have some limitation of external rotation of the right shoulder."

"Circumference of the right arm at the deltoid tubercle was twelve inches and left twelve and a half inches, indicating at least a half inch atrophy of the right arm. The circumference of the right forearm is eleven and three-eights inches, and the left eleven and a half inches, indicating atrophy of the right forearm."

"It was my opinion that the injury which has been sustained to the right upper extremity resulted in persistent residual of limitation of external rotation of the right shoulder; limitation of pronation and supination of the right forearm; and limitation of dorsiflexion and volar flexion of the right wrist, and limitation of active full extension of the fingers of the right hand."

"I was of the opinion that Mr. Pitrie had attained maximum improvement at the time of this last examination, that is, in June of this year—I mean in January of this year. The limitation of external rotation of the right shoulder is probably associated with the residual of the fracture of the greater tuberosity, which was present, but of which there is now no evidence. That is, he had healed up completely and the limitation of external

(3) When he was injured he was working as a deckhand. When he came back to work he had learned to be an engineer and was given that job, which he stated was a better job and paid quite a bit more.

(4) As to his future earnings, while he swore that he thought he would not be able to get a job again as a deckhand, he also swore that he would be qualified and could get a job as an engineer in connection with a Diesel engine of the kind he was working on.

It is not claimed, it could not be, that a jury can award damages on sympathy, caprice, or on possibility, or on any other basis than the evidence in the case as viewed by reasonable minds.

 While we recognize that a judgment refusing a new trial may not be reversed in this court merely because the verdict is excessive in fact, and have many times held that way, we think it clear that it is the inescapable duty of this court, when, as here, the evidence furnishes no sound basis for the verdict, to reverse a judgment for error of law where the trial court has refused to set the verdict aside.

Under that rule, upon these facts and under the circumstances shown here, we think it clear that there was error of law and that it can be corrected only by reversing the cause for excessiveness in law of the verdict and remanding the cause for retrial on the issue of damages.

rotation of the right shoulder is associated with the fracture which he sustained, that is, this fracture of the shoulder which he sustained two and a half years before. The limitation of pronation and supination of the forearm are secondary to changes at the inferior radioulnar joint due to a comminuted fracture of the distal end of the radius, and there is still present irregularity of the articular surface."

"The limitation of extension of the fingers is secondary to the injury of the right wrist."

"*It is my opinion that although Mr. Pitrie is capable of heavy work he has a persistent permanent residual disability of* *the right upper extremity by virtue of* the functional limitation outlined above. There are some associated subjective complaints." (Emphasis supplied.)

On cross examination, he testified further:

Q. "Did you give us some idea of the percentage of disability of his arm? A. I should say that the percentage of disability of the upper extremity as a whole now—the arm, I think the terminology ought to include, or I mean that in the case of an arm in medical parlance, that is what you would call the upper arm, and would not include the forearm of wrist. Thus, if I may be more specific and if I said the whole right upper extremity,

which includes everything from the shoulder blade to the tip of the fingers, it is my opinion that the residual disability is twenty per cent permanent partial disability of the whole right upper extremity."